# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
July 2, 2020

Lyle W. Cayce
Clerk

No. 19-20116

DIGITAL DRILLING DATA SYSTEMS, L.L.C.,

Plaintiff - Appellant Cross-Appellee

v.

PETROLINK SERVICES, INCORPORATED,

Defendant - Appellee Cross-Appellant

Appeals from the United States District Court
for the Southern District of Texas

Before BARKSDALE, HIGGINSON, and DUNCAN, Circuit Judges.

STUART KYLE DUNCAN, Circuit Judge:

Digital Drilling Data Systems, L.L.C. ("Digidrill"), a company that provides software used in oil drilling operations, sued its competitor, Petrolink Services, Inc. ("Petrolink"), alleging Petrolink hacked into its software at various oil drilling sites in order to "scrape" valuable drilling data in real time. The district court granted Petrolink's motion for summary judgment on Digidrill's copyright claims, but allowed Digidrill's unjust enrichment claim to proceed to trial, where a jury ultimately returned a verdict in Digidrill's favor. Both parties appealed. We affirm in part, vacate in part, and remand for further proceedings.

No. 19-20116

## I.

## A.

When oil and gas exploration companies ("operators") drill below the Earth's surface, they often engage directional drilling companies to steer drill bits into specific targets deep underground—a process known as "geosteering." To assist with this process, the directional drillers in turn hire "measurement while drilling" ("MWD") companies who attach specialized tools near the end of the drill pipe just above the drill bit. These MWD tools send "downhole" data up to the surface, including raw data about the location and orientation of the drill bit and about the characteristics of the surrounding geological formation. MWD companies then rely on other companies who furnish data logging and visualization services—hardware and software packages at the surface that collect and store the data from the MWD tools, and also display the data on computer screens in real-time to assist with the geosteering process.

Digidrill is one such data logging and visualization service provider. Digidrill's initial commercial product, a software program called "DataLogger," was designed to be installed on an MWD company's computer to collect raw data from downhole instruments, filter and correct the raw data (based partly on calibration inputs provided by the MWD company), and then log both the raw and corrected data to a database. To prevent unauthorized use of DataLogger, Digidrill designed the program to run only when a USB security dongle is plugged into the laptop.

At the filtering and correction stage, DataLogger applies certain algorithms and scaling factors to account for the context of the raw data. For example, DataLogger applies a formula to raw gamma data received from the downhole gamma ray sensor, scaling and correcting for factors such as gamma ray absorption by drill components located near the sensor. DataLogger

2

No. 19-20116

similarly corrects the raw depth measurement values received from the drill bit.

At the logging stage, the data—both raw and corrected—is written to a computer database consisting of 27 interrelated data tables encompassing a total of 433 columns worth of data. For instance, the corrected gamma data is written in a field called "API" in a table called "GAMMA." Although Digidrill designed the relational structure of the database—i.e., its "schema"—Digidrill did not write the database program itself. Instead, Digidrill developed DataLogger to incorporate an open source database application called Firebird, allowing users to use off-the-shelf programs to access and query the database.[1] But Digidrill did change the file extension for the database files created by DataLogger from ".fdb" (the default extension for Firebird database files) to ".ddb" (for "Digidrill Database"). Digidrill also ensured that the database was protected by an internal password, but left the username and password set to the publicly available Firebird defaults.[2]

---

[1] Digidrill asserts that users can only access and query data from the DataLogger database by going through the program's own "Interface Process," which requires the presence of the USB dongle. But this assertion is contradicted by language regarding DataLogger that appeared on Digidrill's website, which stated: "All data generated by the Digidrill system is stored in an open database file to give the user the ability to query the data using off-the-shelf software products." At the summary judgment stage, the district court acknowledged this by concluding "it was established and known that the DataLogger data files were stored in the Firebird shared library which could be accessed independently from the DataLogger software." Thus, although Digidrill may have *intended* for unsophisticated users to access and query the database only through DataLogger's Interface Process, the company left open—and acknowledged—the possibility that sophisticated users could access the data directly by other means. Indeed, Digidrill acknowledges that only *after* it discovered Petrolink's "hack" did the company implement an additional measure "to kill third-party connections to the DataLogger Application."

[2] DataLogger users never enter the username and password themselves—the credentials are internal to the program. Whenever DataLogger itself queries its own database, DataLogger is programed to send the proper credentials to the Firebird database server.

3

No. 19-20116

Meanwhile, in addition to writing to the database, DataLogger forwards the continuous stream of raw MWD data—but not the corrected data—to the drilling rig's electronic data recorder ("EDR") in a standardized feed called Wellsite Information Transfer Specification ("WITS") for use by other entities at the site.

The DataLogger program itself does not offer real-time visualization of the data it collects or manipulates, although it does allow the data to be exported—after the fact or at intervals—in a standardized report format (".las") or as PDF files. To provide real-time visualization, Digidrill developed a second product called LiveLog. LiveLog provides real-time, off-site visualization of filtered and corrected data transmitted out of DataLogger. The corrected data is pushed out from DataLogger to the internet in a proprietary format developed by Digidrill and can then be viewed using the company's CommandCenter application.

**B.**

Petrolink competes with Digidrill as, among other things, a visualization services provider. Petrolink developed a program called "PowerCollect" to take raw MWD data, such as that forwarded from DataLogger to the EDR, filter the raw data to some extent, and transmit the filtered data to another Petrolink program called "PetroVault" for real-time visualization. However, PowerCollect's reliance on raw data and its inability to provide corrected data in real time resulted in unreliable visualizations, to the frustration of some operators using the program.

When Petrolink learned that one of its largest customers, EOG Resources ("EOG"), might switch over to Digidrill's visualization service, Petrolink took action. Instead of paying Digidrill for access to the corrected drilling data via LiveLog, Petrolink obtained a laptop running DataLogger—along with the corresponding USB security dongle—and then, after realizing

No. 19-20116

DataLogger used an open source Firebird database, managed to gain access to the database by using Firebird's default administrator username and password. Armed with this access, Petrolink developed a program named "RIG WITSML" (dubbed "the scraper" or "the hack") that could be installed on an MWD company's computer running DataLogger in order to—in real time— query corrected drilling data from the DataLogger database and transfer that information to PetroVault for visualization. Petrolink then began installing this RIG WITSML program on MWD computers running DataLogger at more than 300 well sites. The parties agree that Petrolink never sought permission from Digidrill to copy the data or the database schema from the DataLogger databases.

To be sure, RIG WITSML did not scrape *all* the data from the DataLogger database. Out of 433 columns across 27 tables, RIG WITSML read data from 22 columns across 5 tables, and selected data from an even smaller subset: 17 columns across 4 tables. With respect to these portions of the database, however, the RIG WITSML program not only scraped *data* from the database, it also copied the relevant portions of the database *schema*, e.g., the table names and the names of certain columns within those tables. These portions of the database schema were copied into the host computer's RAM and RIG WITSML's own memory each time the program queried the DataLogger database (at ten second intervals), and were also copied in the RIG WITSML source code itself.[3]

---

[3] It is true that the schema of Petrolink's own database, into which the scraped data was ultimately copied, was completely different from the schema of DataLogger's database. However, the district court correctly noted that this does not undermine the fact that Petrolink copied DataLogger's database schema in the source code for RIG WITSML and in the program's memory each time RIG WITSML ran a query.

5

No. 19-20116

## C.

After learning about RIG WITSML, Digidrill sued Petrolink and its president, Lee Geiser, asserting claims of copyright infringement, violation of the Digital Millennium Copyright Act ("DMCA"), unfair competition, unjust enrichment, and various other claims for computer fraud and trademark dilution. Although Digidrill averred that Petrolink's conduct violated the terms of DataLogger's license agreement, which prohibits unauthorized linking of third-party devices to computers running DataLogger, Digidrill did not sue the DataLogger licensees themselves (the MWD companies using the software).[4] Early in the litigation, Petrolink agreed to a preliminary injunction and stopped using RIG WITSML. Digidrill subsequently abandoned all but its claims for copyright infringement, violations of the DMCA, and unjust enrichment. The parties then cross-moved for summary judgment.

The district court granted summary judgment for Petrolink on Digidrill's copyright infringement and DMCA claims, but allowed Digidrill's unjust enrichment claim to proceed to trial. As to copyright infringement, the court first concluded that while the corrected data values generated by DataLogger and written to its database were "mere facts" and therefore not copyrightable, the schema of the database itself—its creative arrangement of tables and columns—was covered by the DataLogger copyright as a non-literal element of DataLogger's source code. However, the district court held that no copyright infringement occurred because even though Petrolink directly and identically copied aspects of DataLogger's database schema, Digidrill failed to meet its burden to show substantial similarity between the original work and the copied

---

[4] The DataLogger license agreement prohibits licensees from linking "any Customer Machine using [DataLogger] with a Machine that is not a Customer Machine" without "prior written consent of [Digidrill.]"

work. As to the DMCA claim, the court ruled that the "Interface Process" and the USB security dongle were not measures that effectively controlled access to the DataLogger database and, further, that although an internal password was in place to guard access to the database, Petrolink did not "circumvent" that measure when it gained access via the publicly available default Firebird password.

As for Digidrill's state law unjust enrichment claim, the district court rejected Petrolink's contentions that the claim was preempted by federal copyright law and that, as a matter of law, the claim could not be proven. The court found no preemption because "the data at issue is factual" and therefore "does not fall within the subject matter of copyright." Finding that a genuine dispute of material fact remained as to whether unjust enrichment occurred, the court denied Petrolink's motion for summary judgment on the issue.

Before trial, Digidrill settled with Mr. Geiser, leaving Petrolink as the sole defendant. During the ensuing trial, the jury was presented with evidence that EOG was one of Petrolink's biggest customers, that Petrolink received $2.4 million in revenues from EOG during the time RIG WITSML was being used at various EOG well sites, that Petrolink attributed $414,940 of that revenue to RIG WITSML, and that—at the time of trial—Digidrill, not Petrolink, was providing visualization services to EOG San Antonio. Although Petrolink produced a list showing RIG WITSML had been installed at 307 well sites (270 of which belonged to EOG), Digidrill countered with evidence suggesting that number was underinclusive.

At trial, Petrolink twice moved for judgment as a matter of law (JMOL) under Federal Rule of Civil Procedure 50(a), arguing once again that Digidrill's unjust enrichment claim was preempted by copyright law and that Digidrill had presented insufficient evidence to support liability for unjust enrichment or monetary recovery. The district court orally denied Petrolink's motions. The

jury then awarded Digidrill $414,940—the exact amount of EOG revenue Petrolink attributed to its RIG WITSML program. After the jury returned its verdict, Petrolink moved for JMOL a third time, which the court summarily denied. The court also denied Petrolink's motion for $1,001,385 in attorneys' fees and costs as the prevailing party under the Copyright Act and DMCA, explaining only that "costs and fees will not be assessed against either party as both prevailed on different issues."

Digidrill and Petrolink each filed timely notices of appeal. Digidrill appeals the district court's grant of Petrolink's motion for summary judgment as to the copyright infringement and DMCA claims. Petrolink cross-appeals the district court's denial of its motions for JMOL and for attorneys' fees.

## II.

"We review a grant of summary judgment *de novo*, applying the same standard as the district court." *Alliance for Good Gov't v. Coalition for Better Gov't*, 901 F.3d 498, 504 (5th Cir. 2018). "Summary judgment is proper where the pleadings and record materials show no genuine dispute as to any material fact, entitling the movant to judgment as a matter of law." *Id.* (citing FED. R. CIV. P. 56(a)). "We must view the evidence in the light most favorable to the non-moving party, drawing all justifiable inferences in the non-movant's favor." *Id.* at 505.

"We review de novo the district court's denial of a motion for judgment as a matter of law, applying the same standards as the district court." *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013). "Judgment as a matter of law is proper if a party has been fully heard on an issue during a jury trial and a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 614 (5th Cir. 2018) (cleaned up) (quoting FED. R. CIV. P. 50(a)). This court "cannot reverse a denial of a motion for judgment as

No. 19-20116

a matter of law unless the jury's factual findings are not supported by substantial evidence, or if the legal conclusions implied from the jury's verdict cannot in law be supported by those findings." *Id.* (quoting *OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*, 841 F.3d 669, 676 (5th Cir. 2016)). "Although our review is de novo, after a jury trial, the standard of review is especially deferential." *Id.* (cleaned up) (quoting *Abraham*, 708 F.3d at 620).

"This court reviews a district court's refusal to award attorney's fees in a copyright infringement case for an abuse of discretion." *Virgin Records Am., Inc. v. Thompson*, 512 F.3d 724, 725 (5th Cir. 2008) (per curiam). "A trial court abuses its discretion in awarding or refusing to award attorney's fees when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Id.* (citation omitted).

### III.

### A.

We begin with Digidrill's claim that the district court erred in granting Petrolink's motion for summary judgment as to copyright infringement. "To prove copyright infringement, a plaintiff must establish (1) ownership of a valid copyright; (2) factual copying; and (3) substantial similarity." *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 549 (5th Cir. 2015) (quoting *Armour v. Knowles*, 512 F.3d 147, 152 (5th Cir. 2007) (per curiam)).

The parties do not dispute the first two elements, i.e., that Digidrill owned a valid copyright in the DataLogger program, including its database schema, and that Petrolink copied portions of that schema in its RIG WITSML program. Instead, the dispute centers on the "substantial similarity" prong.[5] Digidrill argues that the district court erred in granting summary judgment

---

[5] On appeal, Digidrill does not challenge the district court's holding that the drilling *data* scraped from DataLogger's database constituted uncopyrightable facts.

because fact issues remained as to the substantial similarity between DataLogger's schema and Petrolink's copies of that schema. Specifically, Digidrill contends that even though Petrolink copied only 5% of DataLogger's copyrighted schema, a reasonable trier of fact might nevertheless have found substantial similarity due to the "qualitative importance" of that small copied portion. Petrolink argues that Digidrill waived this "qualitative importance" argument by not raising it until Digidrill's motion for reconsideration, filed after the district court granted summary judgment. Digidrill responds that the argument is not waived because it relates to an issue the district court decided *sua sponte*. According to Digidrill, Petrolink moved for summary judgment based on the lack of substantial similarity between the DataLogger database schema and Petrolink's own PetroVault database schema, but the court instead addressed the similarity between the DataLogger schema and the RIG WITSML program.

We hold that Digidrill likely waived its "qualitative importance" argument but, even if not, the argument fails on the merits. "[W]e generally do not consider an issue or a new argument raised for the first time in a motion for reconsideration in the district court." *Davidson v. Fairchild Controls Corp.*, 882 F.3d 180, 185 (5th Cir. 2018) (internal quotation marks and citation omitted). Digidrill is mistaken when it states the district court addressed the similarity between DataLogger's schema and RIG WITSML *sua sponte*, since it was Digidrill itself that directed the court to make that comparison both in Digidrill's own motion for summary judgment on copyright infringement and in its response to Petrolink's cross-motion. And yet, despite directing the court's focus to these two works, Digidrill only argued that the works were substantially similar because "Petrolink's hack made ***exact*** copies of the DataLogger schema." Thus, we are inclined to agree with Petrolink that

Digidrill waived its argument that the two works were substantially similar because of the qualitative importance of the copied schema.

Even so, we need not rely on waiver because Digidrill's qualitative importance argument fails on the merits insofar as Digidrill points to no summary judgment evidence establishing the importance of the copied schema to the DataLogger program as a whole. "While the question of substantial similarity typically should be left to the factfinder, summary judgment may be appropriate if the court can conclude . . . that no reasonable juror could find substantial similarity." *Nola Spice*, 783 F.3d at 550 (internal quotation marks and citation omitted). In determining substantial similarity, we consider, *inter alia*, "the qualitative and quantitative importance of the copied material *to the plaintiff's work as a whole.*" *Id.* at 552 (emphasis added). The summary judgment evidence to which Digidrill points shows, at most, that (1) the copied *data* were important for effective geosteering and (2) copying certain portions of DataLogger's schema was essential to RIG WITSML's effectiveness at obtaining that data. What the evidence does not show is how the copied portions of the schema were qualitatively important to Digidrill's work *itself*, i.e., to DataLogger.[6] Digidrill conflates the importance of the database schema with the importance of the corrected data stored in the database, but the importance of the corrected data is beside the point, since that data is unprotected by copyright law. As for the schema itself, the district court correctly observed that DataLogger's tables and fields could have been arranged in countless different ways.

---

[6] Digidrill argues that "without the schema at issue, DataLogger could not populate its databases with the information ultimately used by the MWD companies and operators to geosteer their wells." But this claim is unsupported by any evidence—Digidrill never shows why the DataLogger database required *the particular relational structure* at issue, as opposed to countless other conceivable arrangements of the MWD data into tables and fields.

No. 19-20116

At oral argument, counsel for Digidrill attempted to describe DataLogger's schema as a "living roadmap" to the database, but that further reveals Digidrill's miscomprehension of the issue. DataLogger's schema consists of the *relationships* between the various tables and fields in the database, not the "roadmap" of that relational structure. While an accurate roadmap is essential for querying any database, it has nothing to do with the qualitative importance of the underlying relational structure itself. For example, in order to successfully query data from DataLogger's API field, one needs to know the API field is found in DataLogger's GAMMA table rather than in DataLogger's DRILLSTREAM table. But that hardly explains, let alone even addresses, the qualitative importance of the API field being in the GAMMA table in the first place, as opposed to some other table. Digidrill fails to show that its chosen relational structure for DataLogger was anything more than arbitrary, let alone qualitatively important.

In sum, we affirm the district court's ruling on copyright infringement because, even if Digidrill's qualitative importance argument is not waived, no reasonable jury could find substantial similarity based on the qualitative importance of the copied schema to DataLogger as a whole.

## B.

Next, we consider Digidrill's claim that the district court erred in granting Petrolink's motion for summary judgment as to the alleged DMCA violations. The DMCA provides: "No person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A). "[T]o 'circumvent a technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." *Id.* § 1201(a)(3)(A). "A technological measure 'effectively controls access to a work' if the measure, in the ordinary

12

course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." *Id.* § 1201(a)(3)(B).

Digidrill argues that the district court committed reversible error by concluding that DataLogger's USB dongle and Interface Process did not "effectively control" access to DataLogger's protected work. Digidrill relies chiefly on *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294 (S.D.N.Y. 2000), *aff'd sub nom. Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001), for the proposition that what matters is whether a technological measure functions to prevent access to the copyrighted work, not whether it provides a strong means of protection. According to Digidrill, the fact that Petrolink was able to access DataLogger's database directly, without using the USB dongle or Interface Process, merely shows that an alternative means of access existed, and the existence of an alternative means of access does not render a technological measure ineffective.[7] Petrolink responds that the USB dongle and Interface Process did not effectively control access to the protected database schema because access to the database itself was available via third party programs without ever encountering those measures and, in any event, Petrolink did not circumvent those measures. Borrowing from a Sixth Circuit opinion, Petrolink likens this to a house with a lock on the back door but none on the front. *Cf. Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 547 (6th Cir. 2004).

We agree with Petrolink—and the district court—that no DMCA violation occurred. While the USB dongle and Interface Process may have

---

[7] Notably, Digidrill does not appeal the district court's conclusion that even if Datalogger's internal-facing database password was a technological measure that controlled access to the protected work, Petrolink did not circumvent that measure when it entered the commonly-known Firebird default credentials.

effectively restricted certain unauthorized uses of the DataLogger software—for example, by preventing MWD companies from duplicating and running the program on laptops at other drilling sites without purchasing additional licenses—these security measures did not effectively control and indeed were not designed to control access to the protected database schema, as evidenced by Digidrill's public acknowledgement that the data was stored in an open database file to allow users to query the database using off-the-shelf products. The database—including its schema—was protected only by an internal-facing password, and Digidrill does not appeal the district court's holding that Petrolink did not circumvent that measure when Petrolink employed the commonly-known Firebird default credentials.

Digidrill's reliance on *Reimerdes* is misplaced. In *Reimerdes*, hackers wrote a computer program "solely for the purpose of decrypting CSS"—a 40-bit encryption technology designed to prevent would-be infringers from duplicating motion picture DVDs. 111 F. Supp. 2d at 317–19 (quoted portion at 319). The hacker program at issue in *Reimerdes*—dubbed "DeCSS"—was developed by "reverse engineer[ing] a licensed DVD player and discover[ing] the CSS encryption algorithm and keys." *Id.* at 311. The defendants argued that CSS, insofar as it was "based on a 40-bit encryption key" was "a weak cipher that d[id] not 'effectively control' access to plaintiffs' copyrighted works." *Id.* at 317. The district court rejected that argument, holding that because CSS prevented access to the protected work on a DVD without the required decryption keys, and because those keys could not be lawfully obtained in the absence of a license, "CSS 'effectively controls access' to copyrighted DVD movies." *Id.* at 317–18.

At most, the portion of *Reimerdes* relied on by Digidrill stands for the rule that a technological measure need not be impenetrable in order to be

"effective" under the DMCA.[8] *See Corley*, 273 F.3d at 441–42. But here the issue is not whether the USB dongle and Interface Process were *effective*; it is whether they *controlled access* to the database schema at all. On this point, the Sixth Circuit's reasoning in *Lexmark* is instructive. In that case, Lexmark argued that its "authentication sequence" effectively controlled access to its Printer Engine Program—a copyrighted work installed on Lexmark printers— because the measure controlled consumers' ability to make use of the program. *See Lexmark*, 387 F.3d at 546. The Sixth Circuit disagreed, holding that although the measure restricted users' ability to make use of the Printer Engine Program, it did not restrict access to the program itself, i.e., to its source code. *Id.* ("Anyone who buys a Lexmark printer may read the literal code of the Printer Engine Program directly from the printer memory, with or without the benefit of the authentication sequence . . . .").[9] Precisely the same is true here: Although the USB dongle and Interface Process limited MWD companies' ability to make use of DataLogger, these measures did not control access to program's database itself, including its protected schema.

Accordingly, we affirm the district court's disposition of Digidrill's DMCA claim. Because we affirm on the basis that the USB dongle and Interface Process did not effectively control access to the database schema, we need not address whether Petrolink circumvented those technological measures.

---

[8] Such a rule is little more than a tautology anyway, since there could never be a DMCA violation for circumventing a technological measure if the only "effective" technological measures recognized by the DMCA were those that could never be circumvented. *Cf. Lexmark*, 387 F.3d at 549 (recognizing that if "a precondition for DMCA liability is . . . the creation of an impervious shield to the copyrighted work . . . the DMCA would apply only when it is not needed").

[9] The Sixth Circuit added: "[O]ur reasoning does not turn on the *degree* to which a measure controls access to a work. It turns on the textual requirement that the challenged circumvention device must indeed circumvent *something*, which did not happen with the Printer Engine Program." *Id.* at 549.

No. 19-20116

## C.

Turning to Petrolink's cross-appeal, we first consider Petrolink's claim that the district court erred by denying Petrolink's motions for JMOL. Specifically, Petrolink argues that the Copyright Act preempts Digidrill's state law unjust enrichment claim and, even if not, Digidrill's claim must fail because (1) there is no legally sufficient evidence to support liability for unjust enrichment and (2) there is no legally sufficient evidence to value the benefit Petrolink allegedly received from Digidrill. We consider each aspect of Petrolink's argument in turn, beginning with preemption.

### 1.

"Section 301 of the Copyright Act preempts state law claims that fall within the general scope of federal copyright law." *Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 845 F.3d 652, 655 (5th Cir. 2017). Consistent with the text of the statute, we employ a two-prong test to determine whether the Act preempts a state law cause of action.[10] *Id.* First, we examine the state claim "to determine whether it falls 'within the subject matter of copyright' as defined by 17 U.S.C. § 102." *Spear Mktg., Inc. v. BancorpSouth Bank*, 791 F.3d 586, 594 (5th Cir. 2015). If so, we then consider the state cause of action "to determine if it protects rights that are 'equivalent' to any of the exclusive rights of a federal copyright, as defined in 17 U.S.C. § 106." *Id.* We ask, "[i]n other words, is state law protecting the same rights that the Copyright Act seeks to

---

[10] 17 U.S.C. § 301(a) reads:

On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

vindicate, or is it protecting against different types of interference?" *GlobeRanger Corp. v. Software AG United States of Am., Inc.*, 836 F.3d 477, 484 (5th Cir. 2016). We evaluate the equivalency of the protected rights by applying the "extra element" test: Preemption does not occur if the state law claim requires "one or more qualitatively different elements." *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 787 (5th Cir. 1999). The party arguing against preemption must show "the presence of any element that renders different in kind its rights under state and federal law." *Id.* at 789.

The district court, when it denied Petrolink's motions for JMOL, did not give reasons why it rejected Petrolink's preemption argument. At the summary judgment stage, however, the court denied Petrolink's motion on the basis of the first prong of the preemption test, holding that the drilling data at issue, being factual, did not fall within the subject matter of copyright. Petrolink disagrees, maintaining that even though the drilling data is not entitled to copyright protection, the data nevertheless falls within the subject matter of copyright. *Cf. Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345, 359 (1991) (holding "it is beyond dispute that compilations of facts are within the subject matter of copyright" even though "copyright protects only the author's original contributions—not the facts or information conveyed"). Indeed, we have recognized that "the Copyright Act preempts more than it protects" and "can preempt a state law claim even if the intellectual property lands in one of § 102(b)'s exclusions." *Motion Medical Techs., L.L.C. v. Thermotek, Inc.*, 875 F.3d 765, 773 (5th Cir. 2017) (citations omitted). This is because "Congress intended the Copyright Act to protect some expressions but not others, and it wrote § 301(a) to ensure that the states did not undo this decision." *Spear*, 791 F.3d at 596. In any event, Digidrill does not attempt to defend the district court's reasoning as to prong one, presumably because to argue the drilling data is not within the subject matter of copyright would undermine Digidrill's

Copyright Act and DMCA claims. Accordingly, for purposes of this appeal, we assume without deciding that prong one is satisfied, and proceed to prong two.

Our court has not previously decided whether an unjust enrichment claim under Texas law satisfies the extra element test. Petrolink argues Digidrill's unjust enrichment claim is preempted by copyright law because the conduct at issue centers on wrongful copying, which is within the scope of copyright law. Digidrill responds that its unjust enrichment claim is not preempted because the extra element test is satisfied: To prevail on a Texas unjust enrichment claim requires showing that one party has obtained a benefit by fraud, duress, or the taking of an undue advantage.

Before addressing the parties' dispute, we pause to summarize our recent cases applying the extra element test to other Texas tort claims. Four years ago in *GlobeRanger*, we held the Copyright Act did not preempt a Texas misappropriation-of-trade-secrets claim. 836 F.3d at 488. GlobeRanger, a software maker, alleged that a competitor had accessed its data, manuals, and software while working on a project for GlobeRanger's former client, the U.S. Navy. *Id.* at 482. We explained that prong two of the preemption test "is met when the conduct for which the plaintiff is seeking protection under state law amounts to the copying that copyright law also proscribes." *Id.* at 484. We added that "[w]hether a claim is equivalent requires looking to the actual alleged misconduct and not merely the elements of the state cause of action." *Id.* at 485 (citing *Alcatel*, 166 F.3d at 788). After carefully considering the allegations, we found them to "go beyond . . . copying, communicating, and transmitting." *Id.* at 486. In particular, we highlighted allegations that the defendant induced a former GlobeRanger employee to violate his nondisclosure agreement and, further, that the defendant knew from technical manuals it obtained that end user agreements prohibited disclosure of their contents. *Id.* Moreover, we emphasized that a Texas misappropriation-of-trade-secrets

claim requires establishing "that the protected information was taken via improper means or breach of a confidential relationship." *Id.* at 488. Accordingly, we concluded that "the state tort provides substantially different protection than copyright law" and "is not preempted." *Id.*; *accord Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc.*, 220 F.3d 396, 404 (5th Cir. 2000) (holding state law claim not preempted "[b]ecause a cause of action under the Louisiana Unfair Trade Practices Act requires proof of fraud, misrepresentation or other unethical conduct").

Shortly after *GlobeRanger*, we decided *Motion Medical*, where a different Texas business tort was at issue: unfair competition by misappropriation. 875 F.3d at 772–73. In finding the plaintiff's state law claim preempted by the Copyright Act, we focused on the required elements of the tort, which, as the parties conceded, did not include an "improper means" element. *Id.* at 775. Similarly, we observed that "the jury instruction never mentioned 'improper means,' nor did it condition liability on a defendant's 'wrongful conduct beyond mere reproduction.'" *Id.* (quoting *GlobeRanger*, 836 F.3d at 488). The plaintiff attempted to avoid preemption by arguing that even though wrongful conduct was not an element of the asserted unfair competition claim, the "discrete facts" of the case showed wrongful conduct. *Id.* at 776. We rejected that argument as self-defeating, clarifying that a litigant "cannot escape copyright's clutches" merely by asserting misconduct above and beyond that required by the cause of action the litigant chose to assert. *Id.*

Applying these cases to Digidrill's unjust enrichment claim, we hold Digidrill's claim is not preempted by copyright because—like the claim in *GlobeRanger*—it requires establishing that Petrolink engaged in wrongful conduct beyond mere reproduction: namely, the taking of an undue advantage. Under Texas law an unjust enrichment claim requires showing that one party "has obtained a benefit from another by fraud, duress, or the taking of an

undue advantage."[11] *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992) (citing *Pope v. Garrett*, 147 Tex. 18, 21, 24 (Tex. 1948)). Digidrill does not allege fraud or duress, but instead contends Petrolink obtained a benefit by taking undue advantage when it surreptitiously installed RIG WITSML on various MWD companies' laptop computers, causing those MWD companies to violate the terms of their DataLogger licenses. This is the claim Digidrill put to the jury. Like the alleged misappropriation-of-trade-secrets claim in *GlobeRanger*, which required establishing improper means or breach of a confidential relationship, Digidrill's alleged unjust enrichment claim requires establishing wrongful conduct—i.e., inducing the MWD companies to violate the express terms of their DataLogger licenses—that goes beyond mere copying.

To be sure, some Texas courts have stated that "recovery under unjust enrichment is an equitable right and is *not dependent on the existence of a wrong*" and "[u]njust enrichment occurs when the person sought to be charged has wrongfully secured a benefit *or has passively received one* which it would be unconscionable to retain." *Villarreal v. Grant Geophysical, Inc.*, 136 S.W.3d 265, 270 (Tex. App.—San Antonio 2004, pet. denied) (cleaned up) (emphasis added). Faced with this language, some observers—including Petrolink—have suggested Texas law actually recognizes two theories or species of unjust enrichment: one for passive receipt of a benefit that would be unconscionable

---

[11] There is some tension in the Texas courts as to whether unjust enrichment is a cause of action or merely a theory of recovery. *Compare Mowbray v. Avery*, 76 S.W.3d 663, 679 (Tex. App.—Corpus Christi 2002, pet. denied) ("[U]njust enrichment is not a distinct independent cause of action but simply a theory of recovery."), *with HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 891 (Tex. 1998) (treating unjust enrichment as a cause of action). We have noted this tension before but have held—as we do again here—that "a party may still recover under the unjust enrichment theory . . . as long as it proves that [the opposing party] obtained a benefit . . . by fraud, duress, or the taking of an undue advantage." *Midwestern Cattle Mktg., L.L.C. v. Legend Bank, N. A.*, 800 F. App'x 239, 245 n.14 (5th Cir. 2020) (per curiam) (cleaned up).

to retain, and another for wrongfully securing a benefit. *See* George P. Roach, *Unjust Enrichment in Texas: Is It a Floor Wax or a Dessert Topping?*, 65 BAYLOR L. REV. 153, 226–28 (2013). But whatever species of unjust enrichment claims might theoretically be available in Texas, the proper object of our extra element test is the unjust enrichment claim *actually alleged. See Alcatel*, 166 F.3d at 787; *see also RDG Ltd. P'ship v. Gexa Corp.*, No. 14-04-00679-CV, 2005 WL 949171, at *4 (Tex. App.—Houston [14th Dist.] Apr. 26, 2005, no pet.) (identifying the wrongful conduct and passive receipt theories of unjust enrichment, but holding "they are fully compatible, and any determination on unjust enrichment will necessarily depend upon the evidence presented in the case"). Here, there is no dispute that the claim Digidrill put to the jury required Digidrill to establish active unjust enrichment by means of wrongful conduct, i.e., that Petrolink took an undue advantage when it caused Digidrill's MWD customers to violate their DataLogger license agreements.

Focusing the extra element test on the state law claim as actually alleged also helps explain why courts sometimes reach different results about copyright preemption for state-law claims of the same name. *See* 1 NIMMER ON COPYRIGHT § 1.15 (2020) [hereinafter NIMMER] ("The label by which a state statute or common law accords rights is not determinative."). Indeed, several of our sister circuits have held various unjust enrichment claims preempted by the Copyright Act where the elements of the unjust enrichment claim at issue differed from the elements under Texas law. *See, e.g.*, *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004) (New York unjust enrichment claim preempted); *Del Madera Props. v. Rhodes & Gardner, Inc.*, 820 F.2d 973, 977 (9th Cir. 1987) (California unjust enrichment claim preempted), *overruled on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994); *Ehat v. Tanner*, 780 F.2d 876, 878 (10th Cir. 1985) (Utah unjust enrichment claim preempted). Unlike the present case, the unjust enrichment

claims in these cases did not turn on active wrongful conduct such as fraud, duress, or the taking of an undue advantage.[12]

In *Del Madera*, for example, plaintiffs claimed that a real estate developer was unjustly enriched when it violated an implied promise not to use plaintiffs' copyrighted map to develop a new subdivision. 820 F.2d at 975. The Ninth Circuit held this claim preempted because "an implied promise not to use or copy materials within the subject matter of copyright is equivalent to the protection provided by section 106 of the Copyright Act." *Id.* at 977. No element in the plaintiffs' California unjust enrichment claim required wrongful conduct beyond unauthorized reproduction.

Several years later, however, the Ninth Circuit held a different unjust enrichment claim *not* preempted by copyright. In *G.S. Rasmussen & Associates, Inc. v. Kalitta Flying Service, Inc.*, 958 F.2d 896 (9th Cir. 1992), an aeronautical engineer claimed that a cargo carrier was unjustly enriched by "free-riding" on his effort to obtain a "Supplemental Type Certificate" ("STC") for a particular airplane. *Id.* at 899–900. The engineer alleged that the carrier declined to license the STC and instead submitted a copy of the unlicensed STC with the carrier's application for an airworthiness certificate. *Id.* at 899–901. In reversing the district court's finding of preemption, the Ninth Circuit

---

[12] Similarly, some courts have held Texas unjust enrichment claims preempted by the Copyright Act, but only where the plaintiffs' allegations were premised solely on wrongful copying and use. *See, e.g.*, *BHL Boresight, Inc. v. Geo-Steering Sols., Inc.*, No. 4:15-CV-00627, 2017 WL 2730739, at *12 (S.D. Tex. June 26, 2017) (claim preempted where allegations were "expressly based on [d]efendants 'access, possession, and use' of [plaintiff's] software and data"); *McArdle v. Mattel Inc.*, 456 F. Supp. 2d 769, 755, 779 (E.D. Tex. 2006) (claim preempted where author alleged Mattel copied author's concepts and ideas in Barbie product line); *Tavormina v. Evening Star Prods., Inc.*, 10 F. Supp. 2d 729, 734 (S.D. Tex. 1998) (claim preempted where homeowners alleged movie studio replicated their house without permission or compensation); *Butler v. Cont'l Airlines, Inc.*, 31 S.W.3d 642, 651 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (claim preempted where programmer alleged employer adopted and copied his macro computer programs without compensation).

explained that the engineer was not claiming an exclusive right to copy the STC, but rather a "right to *use* the STC as a basis for obtaining an airworthiness certificate." *Id.* at 904. The court held that because "violation of the state right is predicated upon an act incorporating elements beyond mere reproduction or the like, there is no preemption." *Id.* (citation omitted).

What matters, then, is the nature of the unjust enrichment claim actually alleged. *Cf.* 1 NIMMER § 1.15[F][4] ("As always . . . it is the underlying reality, rather than the label, that is decisive.").[13] Returning to the present case, Digidrill's unjust enrichment claim is more like the claim in *G.S. Rasmussen* than like the one in *Del Madera*. Had Digidrill merely alleged that Petrolink obtained a benefit at Digidrill's expense by engaging in unauthorized copying, Digidrill's claim might well have been preempted by copyright law. But instead, Digidrill premised its unjust enrichment claim on a further element: that Petrolink's benefit was obtained by "the taking of an undue advantage," i.e., by causing Digidrill's MWD customers to violate the terms of their DataLogger licenses. Because Digidrill's unjust enrichment claim, as alleged, incorporates an element beyond mere unauthorized copying, the claim is not preempted.

The upshot is that our holding on the issue of copyright preemption is limited to the particular state-law allegations presented in this case. We leave open the possibility that other unjust enrichment claims—even those brought

---

[13] We recognize the Nimmer treatise teaches that, generally speaking, "a state-law cause of action for unjust enrichment or *quasi* contract should be regarded as an 'equivalent right' and, hence, preempted insofar as it applies to copyright subject matter." 1 NIMMER § 1.15[G]. The treatise properly critiques courts that have regarded a defendant's "accepting" the benefit of copying a protected work as sufficient to constitute the extra element necessary to avoid preemption. *Id.* Yet the treatise acknowledges that some unjust enrichment claims, such as those premised on deception, may not be preempted. *Id.* The same can be said for a Texas unjust enrichment claim premised on "fraud, duress, or the taking of an undue advantage," like Digidrill's claim *sub judice*.

under Texas law—might indeed be preempted by the Copyright Act. Digidrill's, though, is not.

## 2.

Having determined that Digidrill's unjust enrichment claim is not preempted by the Copyright Act, we next consider Petrolink's assertion that Digidrill's claim fails as a matter of state law. Petrolink argues that under Texas law there can be no "taking of an undue advantage" against a competitor where the defendant acts within its legal rights, as Petrolink claims to have done here. Petrolink relies chiefly on our holding in *Harris County Texas v. MERSCORP Inc.*, 791 F.3d 545 (5th Cir. 2015), which Petrolink interprets as saying that compliance with the law is "dispositive" against an unjust enrichment claim. In response, Digidrill submits that the taking of an undue advantage does not require the violation of a law or legal duty. Digidrill, for its part, attempts to walk a fine line in its briefing. On the one hand, Digidrill unequivocally asserts a theory of unjust enrichment that requires wrongful conduct, i.e., "fraud, duress, or the taking of an undue advantage," because without such an element Digidrill's state law claim is almost certainly preempted. On the other hand, Digidrill is committed to the view that an unjust enrichment claim does not require the violation of a law or legal duty, since to say otherwise would sink Digidrill on the issue of liability.

We hold that the available Texas authorities do not foreclose the possibility that a litigant may show the taking of an undue advantage without showing the violation of a law or legal duty; therefore, the district court did not err in denying Petrolink's motions for JMOL. To be sure, the phrase "taking of an undue advantage" is not well-defined in Texas law. Courts have found an undue advantage where the offending party took advantage of a position of trust. *See, e.g.*, *Chesapeake La., L.P. v. Buffco Prod., Inc.*, No. 2:10-CV-359 (JRG), 2012 WL 2505574, at *5 (E.D. Tex. June 28, 2012), *aff'd in part, vacated*

*in part,* 564 F. App'x 751 (5th Cir. 2014). Courts have also found "undue advantage" where the offending party did not pay for delivered goods and services. *See, e.g.*, *Team Healthcare/Diagnostic Corp. v. Blue Cross & Blue Shield of Tex.*, No. 3:10-CV-1441-BH, 2012 WL 1617087, at *7 (N.D. Tex. May 7, 2012). More to the point, some courts appear to have denied recovery under an unjust enrichment theory *just because* the defendant did not violate a law or legal duty. *See, e.g.*, *MERSCORP*, 791 F.3d at 561; *Shin v. Sharif*, No. 2-08-347-CV, 2009 WL 1565028, at *7 (Tex. App.—Fort Worth 2009, no pet.); *Villarreal*, 136 S.W.3d at 270. But while *MERSCORP*, *Shin*, and *Villarreal* can be read as suggesting that the absence of a violation of law or a legal duty can sometimes be fatal to a Texas claim for unjust enrichment, e.g., where the violation is the only wrongful conduct alleged, these cases do not stand for a rule that "the taking of an undue advantage" *always* requires a violation of law or a legal duty.

In *MERSCORP*, several Texas counties alleged that mortgage lenders such as Bank of America were unjustly enriched when they avoided certain filing fees associated with recording deeds of trust by using MERS, an electronic registry enabling member institutions to transfer promissory notes without the need for a new deed of trust. 791 F.3d at 561. Despite plaintiffs' arguments to the contrary, we concluded that Texas law did not impose a duty to record assignments of promissory notes or deeds of trust. *Id.* at 556. Based on that holding, we rejected plaintiffs' unjust enrichment claim, tied as it was to plaintiffs' view that Texas law imposed a duty to record deeds of trusts and assignments. *Id.* at 561.

In *Shin*, the buyer of a tire business alleged the seller was unjustly enriched when he transferred inventory to his competing tire business and deposited checks made out to the buyer in his own account. 2009 WL 1565028, at *7. The Texas appellate court understood the unjust enrichment claim to

"rel[y] on" breach of a "territorial exclusivity agreement" and/or conversion of the checks. *Id.* Because the court found no valid, enforceable territorial agreement and no evidence of conversion by the seller, the court concluded there was no evidence of "fraud, duress, or the taking of an undue advantage." *Id.* Accordingly, the court rejected the buyer's unjust enrichment claim. *Id.*

Finally, in *Villarreal*, owners of a mineral estate sued two seismic surveyors, claiming the surveyors trespassed on their mineral estate when conducting 3-D seismic surveys nearby, and that in doing so the surveyors acquired data about the mineral estate. 136 S.W.3d at 267. The state court held that, because the surveyors did not physically invade the surface estate above the mineral estate, there was no geophysical trespass. *Id.* at 270. The court then rejected the owners' unjust enrichment claim, stating that "since a trespass did not occur under current Texas law, [the surveyors] did not wrongfully secure a benefit." *Id.*

Taken together, these decisions demonstrate that where a plaintiff's unjust enrichment claim is premised on allegations of illegal conduct, a finding that no illegal conduct occurred necessarily dooms the unjust enrichment claim. Yet these cases, in which the courts focused on the facts before them rather than offering a larger rule about legal violations, do not establish that all undue advantage claims must be premised on illegal conduct. These authorities leave open the possibility that litigants may elect to premise their unjust enrichment claims on conduct that, while not illegal, is nevertheless wrongful, unethical, or otherwise unjust. Here, Digidrill did exactly that. Digidrill's unjust enrichment claim turns on its contention that when Petrolink installed RIG WITSML on various MWD companies' computers, it wrongfully—but not illegally—induced those companies to violate the terms of their DataLogger licenses. Indeed, the district court specifically instructed the jury that Digidrill, in its unjust enrichment claim, was not accusing Petrolink

of violating any statute or committing any criminal act. In other words, the jury was asked to find that Petrolink engaged in wrongful conduct—the taking of an undue advantage—even though Petrolink did not violate a law or legal duty. Nothing in Petrolink's cited authorities prohibited the jury from making such a finding. Thus, the district court did not err in denying Petrolink's motions for JMOL on the question of liability.

**3.**

That brings us to Petrolink's further argument that the district court nevertheless erred in denying its motions for JMOL because Digidrill presented insufficient evidence to support monetary recovery for its unjust enrichment claim. In Texas "[a]n action for unjust enrichment is based upon the equitable principle that a person receiving benefits which were unjust for him to retain ought to make restitution." *Nationscredit Corp. v. CSSI, Support Grp., Inc.*, No. 05-99-01612-CV, 2001 WL 200147, at *6 (Tex. App.—Dallas Mar. 1, 2001, no pet.). As noted, "[a] party may recover under the unjust enrichment theory when one person has *obtained a benefit* from another by fraud, duress, or the taking of an undue advantage." *Heldenfels*, 832 S.W.2d at 41 (emphasis added). At trial on Digidrill's unjust enrichment claim, Question 3 of the verdict form asked the jury: "What is the value of the benefit, if any, you find that Defendant Petrolink obtained from Plaintiff Digital Drilling as a result of [the taking of an undue advantage]?" The jury answered: "$414,940.00"—the amount of revenue from EOG that Petrolink attributed to its RIG WITSML program.

Petrolink argues that the district court erred in denying Petrolink's motion for JMOL because there was no legally sufficient evidence of the value of the benefit Petrolink obtained from Digidrill. According to Petrolink, the only benefit it received from Digidrill was the corrected drilling data itself, not the revenues for its PetroVault visualization service, which included many

other features. Moreover, Petrolink claims that Digidrill was required to adduce evidence of Petrolink's *profits* from PetroVault, not merely its *revenues*. Digidrill responds that while the benefit Petrolink obtained was indeed the corrected drilling data, the *value* of that benefit was the revenue generated by PetroVault. Further, Digidrill contends that even if PetroVault included "other bells and whistles," the jury's choice to ignore such evidence does not merit reversal since this court should uphold the jury's finding if it is supported by *any* legally sufficient evidence.

We agree with Digidrill that the jury's damages award should be affirmed because it is supported by some evidence. At trial, the jury heard testimony that Petrolink installed RIG WITSML at hundreds of well sites operated by EOG, one of Petrolink's biggest customers. Evidence also indicated that after Petrolink was enjoined from using RIG WITSML, EOG switched over to Digidrill for visualization services. Therefore, the jury was entitled to find that the value of the benefit Petrolink received from its taking of an undue advantage was equivalent to the revenue Petrolink received from selling its PetroVault visualization service during the period when Petrolink was installing RIG WITSML at well sites operated by EOG and others. And in any event, the $414,940 from which the jury derived its award did not represent Petrolink's total revenue from selling its PetroVault visualization services to EOG, but rather the small fraction of that revenue—which totaled some $2.8 million—Petrolink itself attributed specifically to the RIG WITSML program.

Petrolink makes much of Digidrill's failure to adduce evidence of Petrolink's expenses, arguing that a plaintiff has the burden to do so "where profits is the measure of damages." But Petrolink cites no authority establishing that, under Texas law, damages for unjust enrichment are to be measured in terms of lost profits. To the contrary, the theory of recovery in an unjust enrichment claim is not that a defendant interfered with plaintiff's

28

profits, but that a defendant received a benefit from plaintiff for which the defendant ought in good conscience to have paid. *See Nationscredit Corp.*, 2001 WL 200147, at *6 ("Recovery [on an unjust enrichment claim] is based on fundamental principles of justice or equity and good conscience which give rise to an implied or quasi-contract to repay the party from which the benefit was received.").

Moreover, even if the jury should have deducted Petrolink's expenses in calculating unjust enrichment damages, the total award is nevertheless supported by at least some evidence. Materials presented at trial suggested Petrolink may have underreported the total number of well sites where it installed RIG WITSML. And, even on Petrolink's reported list, 37 of the listed well sites were not operated by EOG. In other words, there was some evidence that the benefit Petrolink received from taking an undue advantage exceeded the EOG revenues Petrolink attributed to its RIG WITSML program. "[T]he issue is not how the jury arrived at its exact amount of damages; rather, the issue is whether the jury's amount is supported by some evidence." *Helm v. Landry Serv. Co.*, No. 01-94-00348-CV, 1995 WL 319014, at *6 (Tex. App.— Houston [1st Dist.] May 25, 1995, writ denied) (affirming unjust enrichment award equivalent to amount paid for business, even though defendants represented only 3 of 12 shareholders, because evidence showed other unjust profits before sale).

In sum, because there is at least some evidence supporting the award of $414,940, we affirm the district court's denial of Petrolink's JMOL on the issue of whether Digidrill adduced sufficient evidence of the benefit Petrolink obtained from Digidrill.

## D.

Finally, we tackle Petrolink's claim that the district court abused its discretion by denying Petrolink's motion for attorneys' fees under the

No. 19-20116

Copyright Act and DMCA. The Copyright Act and DMCA give courts discretion to award "reasonable" attorneys' fees to the "prevailing party" in cases brought under either Act. 17 U.S.C. §§ 505, 1203(b)(5). Such fee awards encourage the types of lawsuits that promote the statutes' purposes, i.e., "encouraging and rewarding authors' creations while also enabling others to build on that work." *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1986 (2016).

The Supreme Court has recognized that § 505 gives "broad leeway" to courts, and does so without specifying any "guideposts" to use. *Id.* at 1984–85. Nevertheless, the Court has set forth several criteria and principles for courts to follow. *See id.* In *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994), the Court imposed two restrictions on courts' broad discretion. First, courts must not simply award fees to the prevailing party as a matter of course. *Id.* at 533. Second, courts must treat prevailing plaintiffs and prevailing defendants alike, rather than holding defendants to a more stringent standard. *Id.* at 534–35. In addition, the Court listed "several nonexclusive factors to guide courts' discretion," including "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."[14] *Id.* at 534 n.19 (citation omitted). More recently, the Supreme Court counseled that courts "should give substantial weight to the objective reasonableness of the losing party's position." *Kirtsaeng*, 136 S. Ct. at 1983. That said, the Court emphasized that "objective reasonableness can be only an important factor in assessing fee applications—not the controlling one." *Id.* at

---

[14] Although *Fogerty* concerned an award of fees under § 505 of the Copyright Act, courts have treated *Fogerty*'s standards as equally relevant to the DMCA. *See, e.g.*, *Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, L.P.*, No. CV H-14-1903, 2018 WL 2048896, at *12–16 (S.D. Tex. May 2, 2018), *vacated on other grounds*, 948 F.3d 261 (5th Cir. 2020).

1988; *see also id.* at 1989 (cautioning against "turning 'substantial' into more nearly 'dispositive' weight").

We have not yet had occasion to apply *Kirtsaeng*. However, even against the backdrop of *Fogerty*'s admonition that fees should not be awarded to prevailing parties as a matter of course, we have repeatedly stated that "an award of attorney's fees to the prevailing party in a copyright action is the rule rather than the exception and should be awarded routinely." *Virgin Records*, 512 F.3d at 726 (internal quotation marks and citation omitted); *see also Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 588–89 (5th Cir. 2015).

Petrolink argues that even though Digidrill prevailed on its unjust enrichment claim, "Petrolink won a complete victory on the copyright and DMCA claims" and was therefore the "prevailing party" under §§ 505 and 1203(b).[15] Petrolink submits that whether Digidrill prevailed on any non-copyright claim is irrelevant to the prevailing party analysis under the Copyright Act and DMCA.

We agree with Petrolink. In denying Petrolink's post-trial motion for attorneys' fees, the district court stated only that "costs and fees will not be assessed against either party as both prevailed on different issues." It is difficult to make sense of this language in light of the fact that Petrolink only sought fees related to Digidrill's copyright and DMCA claims, on which Petrolink clearly and solely prevailed. It matters not whether Digidrill ultimately prevailed on its state law unjust enrichment claim. *See Balsley v. LFP, Inc.*, 691 F.3d 747, 772–74 (6th Cir. 2012) (affirming fee award to party who prevailed on one copyright claim, agreed to dismiss two other copyright

---

[15] Petrolink did *not* move for attorneys' fees related to Digidrill's other claims, but rather only for the work Petrolink did on the copyright and DMCA claims up until the district court granted summary judgment.

claims without prejudice, and lost on four state law claims). The failure of Petrolink's copyright preemption argument does not undermine this result, but rather confirms that the sole claim on which Digidrill prevailed—unjust enrichment—was not a copyright infringement claim. *Cf. Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 893 (6th Cir. 2004) (affirming fee award because "when a defendant succeeds in having summary judgment entered in its favor on the copyright infringement claims asserted against it, that defendant can only be described as having 'prevailed'" regardless of separate copyright preemption issue). Besides, a litigant may be a prevailing party under § 505 even if the party fails to prevail "in full" on its *copyright* claims. *See Thoroughbred Software Int'l, Inc. v. Dice Corp.*, 488 F.3d 352, 362 (6th Cir. 2007); *see also* 4 NIMMER § 14.10[B][3].

Not only did the district court erroneously treat Petrolink as though it was not the sole prevailing party on the copyright claims, the court also failed to apply the correct legal standard set forth in *Fogerty*. We have on occasion affirmed a district court's refusal to award fees to the prevailing party in a copyright case, but only where the district court laid out the *Fogerty* factors and "then applied those factors to the facts of th[e] case and determined that they weighed against awarding attorney's fees." *Virgin Records*, 512 F.3d at 726; *see also Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 510 (5th Cir. 2012); *Positive Black Talk Inc. v. Cash Money Records Inc.*, 394 F.3d 357, 381–82 (5th Cir. 2004), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010); *Creations Unltd., Inc. v. McCain*, 112 F.3d 814, 817 (5th Cir. 1997) (per curiam). On the other hand, we have vacated and remanded a fee award where "[t]he district court did not consider any of the four factors set forth in *Fogerty*." *Galiano v. Harrah's Operating Co.*, 416 F.3d 411, 423 (5th Cir. 2005). Here, as noted, the district court failed to cite or acknowledge the correct legal standard announced in *Fogerty*, let alone apply

any of the *Fogerty* factors to the facts of the case. The district court's failure to identify or apply the correct legal standard—on an issue worth nearly three times the value of the jury award—constitutes an abuse of discretion. *See Virgin Records*, 512 F.3d at 725.

Because the district court both failed to treat Petrolink as the prevailing party under the statutes and failed to apply the correct legal standard from *Fogerty*, we vacate the district court's denial of Petrolink's motion for fees and remand for the district court to properly analyze the motion.[16] Although the district court may, on remand, exercise its discretion to deny Petrolink's motion for fees, "[t]he district court should provide a *Fogerty* analysis in its ensuing opinion so that its ruling can, if needed, be reviewed on appeal." *Galiano*, 416 F.3d at 423.

\* \* \*

For the foregoing reasons, we AFFIRM the district court's summary judgment as to Digidrill's copyright and DMCA claims. We also AFFIRM the district court's denial of Petrolink's motions for JMOL. However, we VACATE the district court's order denying Petrolink's motion for attorneys' fees under the Copyright Act and DMCA, and REMAND for the district court to reconsider that motion in light of this opinion.

---

[16] Because we remand for the district court to reconsider Petrolink's motion for attorneys' fees under the Copyright Act and DMCA, we need not reach Petrolink's further argument that Digidrill's copyright claims were objectively unreasonable. We express no view on that issue.